UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONYELLE WOODS,

             Petitioner,                     Case No. 09-cv-11455

v.                                    HONORABLE STEPHEN J. MURPHY, III

KENNETH McKEE,

             Respondent.

_____/

**OPINION AND ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS** (document no. 30) **AND GRANTING A CERTIFICATE OF APPEALABILITY**

      Petitioner Donyelle Woods ("Woods"), a state inmate in the custody of the Michigan Department of Corrections, seeks habeas relief pursuant to 28 U.S.C. § 2254. He challenges his convictions for first-degree murder, Mich. Comp. Laws § 750.316, and possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b, on the grounds that (1) his right to confrontation was violated, and (2) the prosecutor committed misconduct by suppressing exculpatory evidence. For the reasons stated below, the petition for a writ of habeas corpus is denied. The Court will, however, grant Woods a certificate of appealability with respect to both claims.

**BACKGROUND**

      This case arises from the shooting death of Eric Harris ("Harris"), a drug dealer who was killed at night while using a payphone in 2003. Woods' first trial ended with a hung jury. He was found guilty on retrial. Evidence presented at trial indicated that Chavez Johnson was with Woods during the shooting and earlier that day. Johnson was at the scene after

the shooting when the police arrived and was initially regarded as a suspect. Police found no firearms in the area and cleared Johnson after he passed a gunshot residue test. Johnson told police he did not know the shooter but saw the shooter argue with Harris earlier that evening at the "Green House," a drug house operated by Harris. Johnson later helped a police artist complete a sketch of the shooter. He was murdered prior to the trial and his statement about seeing the shooter at the Green House was not presented to the jury.

Two witnesses, Gloria Moses ("Moses") and David Jennings ("Jennings"), testified at trial about an argument between Harris and two men, neither of them Woods, at the Green House on the day of the murder. Harris and Johnson left the Green House sometime after the argument.

Tomeka Shaw ("Shaw"), Harris's girlfriend, testified that Harris ran the Green House. She was on the phone with Harris when Harris was shot. Harris told Shaw that he was at the gas station and that someone had just pulled a gun on him. Shaw heard screaming, rushed to the scene with others, and found Harris lying dead by the pay phone.

Maurice Harris ("Maurice") testified that he was the victim's cousin. He testified that he knew Woods and saw a confrontation between Woods and Harris in January 2003. He was the prosecutor's only witness to establish a prior relationship between Harris and Woods.

Sandra Taylor ("Taylor") testified that shortly before the shooting, she contacted Harris to purchase drugs, went to the gas station, and saw Harris talking on the payphone. She saw a car approach and watched as Woods–who she knew at the time as "Ferdinand"–emerged from the car and shot Harris multiple times. She also saw Johnson

2

in a white jogging suit running to and from the scene. She chose not to speak with police at the scene but her testimony corroborated other evidence, including Harris being on a payphone, Johnson's clothing and actions, screaming, and the number of gunshots. Taylor saw Woods in a car outside a local market several days after the shooting. When Woods asked her to come up to the car, Taylor refused and retreated inside the store. Moses corroborated this incident by testifying that she saw Taylor at the market refusing to leave, claiming that Harris's shooter was outside and pointing to a small gray or blue car. Because the police never recovered a gun or identifying forensic evidence linking Woods to the shooting, Taylor's testimony was integral to the prosecutor's case.

Patrick Gray, a truck driver, testified that he heard the shots from the cab of his parked truck and testified at trial that he saw a dark blue or dark gray car leave the scene. He also saw Johnson run from the scene and return to the victim's side minutes later.

Officer Michael Carlisle ("Officer Carlisle") was assigned to the case. He testified that Johnson was taken into custody at the scene and gave a description of the shooter once it was apparent that Johnson was not the perpetrator. As the shooting occurred late on a Thursday night, Officer Carlisle said he could not get a sketch artist until the following Monday. On Monday, Johnson helped the artist create a sketch of the perpetrator. When the prosecutor had Officer Carlisle identify the sketch at trial, defense counsel objected on hearsay grounds. The Court overruled the objection, noting the sketch had already been admitted as an exhibit during Taylor's earlier testimony. *See* 3/16/04 Tr. 63–64, No. 36-10.

The hair described in Taylor's statement, 3/15/04 Tr. 113, ECF No. 36-9, did not match the sketch. The prosecutor showed Taylor the sketch on re-direct and Taylor said it accurately depicted Woods' appearance on the night of the shooting, not several days

later at the market. The sketch was admitted as an exhibit without objection. *Id.* at 114–15.

Early in the investigation, Officer Carlisle and Officer Charles Zwicker ("Officer Zwicker") canvassed the area of the shooting to see if anyone recognized the individual depicted in the sketch. The officers received information that a person called "Memphis" witnessed the shooting. An anonymous tip revealed "Memphis" to be Taylor and police located her at a group shelter. During questioning, Taylor confirmed to police she was at the scene of the shooting. She later made a statement identifying the shooter and the man depicted in the sketch as "Ferdinand." Taylor did not know his real name and was hesitant to cooperate because she knew that Johnson had been murdered.

During the investigation, Officer Carlisle was transferred to another unit and Officer Zwicker took over. Needing more support for his case, Officer Zwicker testified that he showed the sketch to other officers in the area, one of whom identified the sketch as resembling Woods. Officer Zwicker obtained a photograph of Woods, showed it to Taylor, and Taylor identified Woods as "Ferdinand."

The jury convicted Woods. He was sentenced as a fourth-time habitual felony offender to life imprisonment for the murder conviction and a consecutive two-year term for the firearm offense. Woods appealed to the Michigan Court of Appeals with claims not presented in this action and the court affirmed. *People v. Woods*, No. 254993, 2005 WL 2372081 (Mich. Ct. App. Sept. 27, 2005). Woods applied for leave to appeal to the Michigan Supreme Court but was denied by standard order. *People v. Woods*, 711 N.W.2d 318 (2006).

Woods filed a post-conviction motion for relief from judgment and was denied. The trial court rejected Woods' Confrontation Clause claim on the merits, citing *Crawford v.*

4

*Washington*, 541 U.S. 36 (2004), to find that the "use of a sketch is not testimonial in nature." Ex. O 4, ECF No. 28-7. The court analogized the case to *Davis v. Washington*, 547 U.S. 813 (2006), and found that the sketch was admissible because it was used to help capture the shooter and "was necessary to resolve the present emergency, rather than learn what had happened in the past to establish evidence of a crime." *Id.* at 5.

Woods appealed this decision to the Michigan appellate courts, both of which denied relief citing Michigan Court Rule 6.508(D). *People v. Woods*, No. 282365 (Mich. Ct. App. May 12, 2008); *People v. Woods*, 762 N.W.2d 519 (Mich. 2009). Woods filed a second and third motion for relief; neither motion raised claims pertinent to this action. The motions and subsequent appeals were denied.

Woods filed a habeas corpus petition in this Court while anticipating a fourth state post-conviction proceeding. The Court ordered the case stayed and held in abeyance pending exhaustion of state court remedies. Op., ECF No. 11. Woods filed a fourth motion for relief from judgment and claimed to attach an unsworn statement from Taylor recanting her trial testimony and admitting to perjury at the trial when she identified Woods as the murderer. He also claimed that Taylor stopped cooperating with Woods' attorneys after they refused to pay her five hundred dollars. *See* Def. Mem. 20 n. 12, ECF No. 36-15. The Court cannot locate this statement in the materials filed with the Court. Woods claimed he was innocent of the murder and presented the state court with materials obtained through Freedom of Information Act ("FOIA") requests that he argued were unconstitutionally suppressed by the prosecutor. Woods alleged that Taylor's recantation and the FOIA materials constituted newly discovered evidence excusing his failure to present them in his prior appeals and motions. Woods further claimed that he was innocent of the murder.

5

The trial court held an evidentiary hearing on the motion. The court heard testimony from Woods' trial counsel, Kristi Glenn; retired Detroit Police Detective Michael Carlisle; and Tennessee attorney Burke Keaty. Taylor did not appear and the record does not indicate any efforts were used to procure her appearance. Keaty testified that he interviewed Taylor in 2009 during which she said she was not at the scene of the shooting.

The trial court denied the motion. *See* Ex. R, ECF No. 28-10.  The court (1) found Woods' claim of innocence unpersuasive, (2) denied his claim of suppressed evidence on the merits, and (3) held his claims barred under Michigan Court Rules 6.502(G) and 6.508(D)(3) on the grounds that they could have been raised previously and they were not based on newly discovered evidence.

Woods' appeal to the Michigan Court of Appeals was denied for failure to establish entitlement to relief under Rule 6.508(D). *People v. Woods*, No. 310536 (Mich. Ct. App. Nov. 30, 2012). Woods filed an application for leave to appeal with the Michigan Supreme Court and was denied on the same grounds. *People v. Woods*, 834 N.W.2d 488 (2013).

Woods timely filed a motion to reopen the present case, the parties filed supplemental pleadings, and the case is now ready for decision.

## STANDARD OF REVIEW

As amended by The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas cases are reviewed pursuant to 28 U.S.C. § 2254(d) (1996):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

6

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of [the statute] permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of that decision." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Furthermore,

> Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Harrington,* 562 U.S. at 102–3 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 (1979) (Stevens, J., concurring)).

To obtain relief, a petitioner must show that the state court either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ; or (2) resulted in a decision that was based on an

7

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1); *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). Such determinations of fact are presumed correct and the petitioner may only rebut it with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir. 1998).

## DISCUSSION

Woods raises two claims for habeas relief: (1) his right to confrontation was violated by the admission of a sketch based on the description of an eyewitness to the shooting; and (2) the prosecutor committed misconduct by suppressing exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). Respondent filed an answer in opposition, arguing that the claims are barred from federal review by Woods' state court procedural defaults.

I.    Procedural Default

Woods raised the confrontation claim in his first motion for relief from judgment. Respondent asserts that the review is barred by Michigan Court Rule 6.508(D)(3) for failing to raise the claim during his appeal of right and failing to meet the rule's "good cause" and "actual prejudice" exceptions. "[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989). If the last state court judgment affirms the conviction in a standard order with no reasoning, the federal habeas court looks to the last reasoned state court judgment rejecting the federal claim and presumes that "later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

8

The Michigan appellate courts rejected the first post-conviction appeal for "fail[ing] to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Woods*, No. 282365 (Mich. Ct. App. May 12, 2008). The rationale, however, did not reference 6.508(D)(3) or Woods' failure to raise the claim on direct appeal. Because it is unclear whether the form orders citing Rule 6.508(D) refer to procedural default or a denial of post-conviction relief on the merits, the orders are unexplained. *See Guilmette v. Howes*, 624 F. 3d 286, 291 (6th Cir. 2010). The Court must look to "the last reasoned state court opinion" to learn why the claims were rejected. *Id.* The state trial court rejected Woods' confrontation claim on the merits. The court invoked the requirements of Rule 6.508(D)(3) in other parts of its opinion but did not apply the rule to Woods' first habeas claim as a primary or alternative basis for its decision. Ex. O, ECF No. 28-7; *see, e.g., Alvarez v. Straub*, 64 F. Supp. 2d 686, 695 (E.D. Mich. 1999). Accordingly, Woods' first habeas claim was not defaulted in the state courts.

Respondent asserts that the *Brady* claim is barred from review under Michigan Court Rules 6.502(G) and 6.508(D)(3) for failure to show that it was based on new facts that were not available for previous motions for relief from judgment. The state trial court relied on this rule when it denied Woods' fourth motion for relief from judgment. The cause and prejudice standard that a habeas petitioner must meet to excuse a state court procedural default tracks the last two elements of a *Brady* claim: suppression by the government and materiality. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *see also Strickler v. Greene*, 527 U.S. 263, 282 (1999) ("cause and prejudice parallel two of the three components of the alleged Brady violation itself"). If the merits of a habeas claim "present a more straightforward ground for decision," the Court may consider the merits of the claim first

and then address the procedural default question only if necessary. *Arias v. Hudson*, 589 F.3d 315, 316 (6th Cir. 2009) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). That is the case here. The Court will address the merits of the confrontation claim because it was not defaulted and the *Brady* claim because it presents a more straightforward ground for decision.

II.    Admission Of The Police Sketch

Woods argues that his right to confrontation was violated when, at trial, the prosecutor used the police composite sketch drawn from Johnson's description of the shooter. Because Johnson was deceased and unavailable to testify at trial, Woods claims that the sketch constitutes testimonial hearsay that is constitutionally barred from presentation. Respondent argues that the sketch was not hearsay because it was not offered for the truth of the matter asserted; rather, it was used to explain the course and result of the police investigation. That position, however, contradicts a portion of the prosecutor's closing argument: "Look at this sketch and you decide whether or not in addition to the testimony of Sandra Taylor, another eye-witness picked out this defendant as being the shooter." 3/17/04 Tr. 59, ECF No. 36-11. As there was no limiting instruction regarding the jury's consideration of the sketch, the Court finds that the sketch was offered for the truth of the matter asserted: that Johnson thought the man in the sketch was the same man who shot the victim.

The issue, however, is whether the state court unreasonably applied clearly established Supreme Court law under §2254(d)(1) when it adjudicated the claim on the merits and held that no violation occurred. For temporal purposes under §2254(d)(1), "clearly established law" is the law at the time the state court adjudicated the claim. *Greene*

10

*v. Fisher*, 132 S. Ct. 38 (2011). The state court adjudicated this claim two years after the Supreme Court changed its interpretation of the Confrontation Clause regarding the admission of hearsay. Prior to *Crawford v. Washington*, 541 U.S. 36 (2004), hearsay admission turned on whether the hearsay bore sufficient indicia of reliability. *See generally Ohio v. Roberts*, 448 U.S. 56, 66 (1980) ("reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception"). In *Crawford*, however, the Supreme Court held that the Confrontation Clause bars out-of-court statements that are testimonial in nature regardless of whether the statements are deemed reliable. *Crawford,* 541 U.S. at 68. The analysis shifted from a determination of whether statements were reliable to a determination of whether statements were testimonial.

The Supreme Court's consolidated decision in *Davis v. Washington* and *Hammon v. Indiana* was the only decision to clarify the scope of "testimonial hearsay" after *Crawford* and before the state trial court's rejection of Woods' claim. 547 U.S. 813 (2006) ("Davis"). The Supreme Court identified types of statements that are testimonial and nontestimonial "[w]ithout attempting to produce an exhaustive classification." *Id.* at 822. In the first case, a domestic assault victim made statements to a 911 operator while reporting an ongoing incident. *Id.* at 817. In *Hammon*, the companion case to *Davis*, a domestic assault victim completed an affidavit while answering questions from a police officer at her home who responded to a to an incident with her husband, who was nearby and guarded by a second officer. *Id.* at 819–20. The Court provided the following guidance for distinguishing between testimonial and nontestimonial statements made in response to police questioning:

> Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made

> in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Id. at 822.

Accordingly, the Supreme Court held that the statements made to the 911 operator in the first case were nontestimonial because "the circumstances of [the] interrogation objectively indicate[d] its primary purpose was to enable police assistance to meet an ongoing emergency." *Id.* at 828. Specifically, the statements were nontestimonial evidence because: (1) the person was speaking about events as they were actually happening, rather than describing past events; (2) any reasonable listener would recognize that the person was facing an ongoing emergency; (3) the nature of the questions asked and the answers given were necessary to be able to resolve the present emergency, rather than simply to learn what had happened in the past; and (4) there was an absence of formality in the conversation with the operator. *Id.* at 827.

In *Hammon*, the Supreme Court held that the statements made in the affidavit were testimonial because they were "part of an investigation into possibly criminal past conduct." *Id.* at 829. The Supreme Court noted that (1) there was no emergency in progress at the time of the interrogation because the victim's husband was still in the house and guarded by another officer; (2) the officer who questioned the witness "was not seeking to determine . . . 'what is happening,' but rather 'what happened'"; and (3) the primary purpose of the interrogation "was to investigate a possible crime." *Id* at 829–30.

Relying on this limited body of clearly established law, the trial court found that Johnson's statements were nontestimonial because the primary purpose of using his

12

statements to create the sketch was to assist the police with the ongoing emergency of apprehending an unidentified shooter still at large. Ex. O 4–5, ECF No. 28-7. The Supreme Court has since stated that the determination of whether "an emergency exists and is ongoing is a highly context-dependent inquiry." *Michigan v. Bryant*, 562 U.S. 344, 363 (2011). *See also Williams v. Illinois*, 132 S. Ct. 2221, 2240–41, 2243–44 (2012) (the admission of an expert's opinion about a DNA report that he did not author does not violate the confrontation clause because the purpose of the opinion was to catch an at-large criminal, not to target the defendant). It is likely that the state trial court is better positioned now to decide the issue than it was in the past; nevertheless, the deference owed to the state court's decision to reject Woods' confrontation claim is substantial. Woods must show that the decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103; *see also Metrish v. Lancaster*, 133 S. Ct. 1781, 1786–87 (2013). He has not made such a showing.

The state court focused on the circumstances under which the sketch was made. It reasoned that the sketch was not drawn primarily to establish or prove a past fact; rather, it was to assist the police in apprehending an at-large, unidentified shooter. Woods argues that the four-day delay between the shooting and the production of the sketch precludes a finding that there was an "ongoing emergency." He argues that the sketch is more akin to the statements in *Hammon* than to those in *Davis*. Given the limited body of clearly established law available to the trial court at the time, the Court disagrees.

While four days is a long period of time compared to the real-time description of the emergency in *Davis*, the facts do not lend enough weight to the argument that the sketch

13

"was not seeking to determine . . . 'what is happening,' but rather 'what happened'" to overcome the strong deference owed to the state court. *Davis*, 547 U.S. at 830. Although the unavailability of the sketch artist led to a four-day delay between the shooting and the completion of the sketch, the perpetrator's whereabouts were still unknown at the time the sketch was completed and Johnson appeared be the only eyewitness available to describe the shooter. For the state court, the unknown location of the offender likely exhibited the strongest contrast to the facts in *Hammon*. In *Hammon*, police arrived at the home to find the victim on the porch and her husband – the alleged assailant – inside the house. In other words, the police had already identified and secured the perpetrator, and were simply trying to understand what happened. The circumstances in this case fall between the immediate phone call in *Davis* and the already-apprehended perpetrator in *Hammon.* A fairminded jurist could reasonably describe this as an "ongoing emergency."

Because the Supreme Court had yet to address whether statements made to identify an at-large violent offender are statements about an "ongoing emergency," it is improper to describe the state court's conclusion as "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103; *Metrish*, 133 S. Ct. at 1786–87. Accordingly, the Court finds that Woods has failed to demonstrate entitlement to relief with respect to this claim under §2254(d).

III.   <u>Suppression Of Evidence</u>

Woods claims that the prosecutor suppressed four pieces of material and exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). To demonstrate a *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because

14

it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281–82. A finding of prejudice requires a showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 432–36 (1995). The duty to disclose favorable evidence includes the duty to disclose impeachment evidence. *Bagley*, 473 U.S. at 676.

    A.    Officer Zwicker's Case Notes

    Woods asserts that the prosecutor never disclosed a case note prepared by Officer Zwicker that revealed Officer Zwicker's conclusion that the shooter was one of the men seen arguing with Harris in the Green House on the day of the shooting. In the note, Officer Zwicker suggests that the police "round up" witnesses to identify Woods as one of the two men seen at the Green House. Woods argues that Officer Zwicker could have been cross-examined at trial regarding his belief that the shooter was at the Green House. At the evidentiary hearing held for Woods' fourth motion for relief from judgment, Woods' trial attorney testified that she had not seen Officer Zwicker's note prior to trial. Respondent argues that the note merely reflects a police officer's personal theory at a point in an ongoing investigation and doesn't suggest that any follow-up investigation led to additional undisclosed witnesses or admissible evidence that would have exculpated Woods.

    The Court finds Woods' claim unpersuasive. Officer Zwicker's note is not evidence and his personal opinion on the question of who committed the offense is inadmissible at trial. See *Cooper v. Sowders*, 837 F.2d 284, 287 (6th Cir. 1988); *Gonzales v. Thaler*, 643 F.3d 425, 428 (5th Cir.  2011). Woods could not have used the note on its own or to elicit

testimony from Officer Zwicker about his belief that the shooter argued with Harris at the Green House. It could only meet *Brady's* materiality requirement if it led directly to admissible evidence and Woods does not make that argument. *See Wood v. Bartholomew*, 516 U.S. 1, 6 (1995); *Wogenstahl v. Mitchell*, 668 F.3d 307, 325 n.3 (6th Cir. 2012) (quoting *Sawyer v. Hofbauer*, 299 F.3d 605, 614 (6th Cir. 2002)). He only argues that the note could have been used to challenge the integrity of the investigation by showing that the police were determined to pursue Woods despite contradictory personal beliefs. This argument is too speculative to justify relief. "The fact that other people were considered suspects does not mean that, after ruling these individuals out, the detectives' case was any weaker against [the Defendant]." *Thorne v. Timmerman-Cooper*, 473 F. App'x 457, 467 (6th Cir. 2012).

The jury was made aware of the fact that the police could not identify Woods as one of the two men who argued with Harris at the Green House. Defense counsel exploited this failed line of investigation during the cross-examination of Moses and Jennings when they testified that they were at the Green House at the time of the argument and did not see Woods. In closing arguments, defense counsel highlighted the prosecutor's failure to connect Woods to the men at the house. Officer Zwicker's note is simply a memorialization of an obvious failed line of investigation and would not have benefitted Woods beyond what was already presented to the jury. As such, Woods has not demonstrated a reasonable likelihood that the result of his trial would have been more favorable had Officer Zwicker's note been disclosed to the defense prior to trial.

B.     Officer Carlisle's Opinion Regarding Johnson's Murder

Woods asserts that during trial, the prosecutor and police repeatedly suggested that

16

Woods murdered Johnson to prevent him from testifying. Woods argues that at the time of trial, Officer Carlisle failed to disclose his conclusion that the murders of Harris and Johnson were unrelated. Officer Carlisle testified to this conclusion at the evidentiary hearing and explained that his investigation revealed that Johnson was visiting a friend and was killed during a drive-by shooting. 5/12/2011 Tr. 49, ECF No. 36-18.

Woods' allegation fails for the same reasons as above. Officer Carlisle would not have been permitted to testify that he believed Woods was not responsible for Johnson's murder. *Cooper*, 837 at 287. At the evidentiary hearing, Woods' counsel asked Officer Carlisle about his "conclusions" for Johnson's murder and a brief description of the circumstances of Johnson's shooting. Woods never argued that knowing Officer Carlisle's opinion prior to trial would have prompted defense counsel to more thoroughly investigate Johnson's murder and possibly uncover evidence that the murders were unrelated. Prior to trial, defense counsel knew that Johnson had been murdered and, as a matter of choice, could have obtained witness statements and other information to suggest that the two murders were unconnected. Officer Carlisle's opinion would not have yielded any such evidence. Even if it did, Officer Carlisle's conclusion is another example of allegedly suppressed inadmissible information. This Court cannot conclude that undisclosed inadmissible evidence would lead directly to admissible evidence based on mere speculation. *Wood*, 516 U.S. at 6. The Court finds this claim to be without merit.

C.    Taylor's Open Arrest Warrants

Woods claims that the prosecutor suppressed the fact of Taylor's open arrest warrants in Michigan and Tennessee at the time of trial and leveraged these warrants to secure favorable testimony. He argues that the warrants would have provided powerful

17

impeachment testimony to undermine the credibility of the prosecutor's key witness. Woods' trial attorney testified at the hearing that she was not aware of the open warrants.

Woods may have a substantial claim under *Giglio v. United States* if Taylor struck a deal for her testimony or the police threatened her with prosecution. 405 U.S. 150, 154–55 (1972) (the prosecutor must disclose an agreement not to prosecute witness in exchange for testimony as the agreement is relevant to a determination of the witness's credibility). Taylor was not, however, produced at the state court hearing. Other than the hearsay testimony of a Tennessee attorney who interviewed her in prison, 5/12/11 Tr. 63, ECF No. 36-18, Woods produced no evidence that an arrangement existed. The Court thus finds that Woods has failed to show that any impeachment evidence was suppressed.

Woods still argues that the warrants could have been used for impeachment. Defense counsel, for example, could have elicited testimony that Taylor subjectively hoped to curry favor by testifying for the prosecutor. But the fact of Taylor's open warrants was well-known at the time of trial: Taylor's Tennessee convictions were referenced at trial and Taylor testified that she did not approach the police at the scene of Harris's murder because of the warrants. 3/15/04 Tr. 58–59, 97, 122, ECF No. 36-9. Even defense counsel testified at the hearing that the prosecutor gave her information about Taylor's criminal history. 5/12/11 Tr. 37, ECF No. 36-18. The Court finds that even if the disclosed information about Taylor's criminal history was incomplete, it is not reasonably probable that the revelation of any more charges would have changed the result. The claim is without merit.

### D.  Letter Regarding Shaw's Acts of Violence Towards Harris

Woods asserts that police possessed a letter prior to trial showing that Harris and

18

Shaw's relationship was tumultuous and violent. Defense counsel testified that she never saw the letter but if she had, she would have investigated the possibility that Shaw was responsible for the murder. The amended petition includes a letter dated May 13, 2003 from Harris's sister to Officer Carlisle claiming that Harris was having major problems with Shaw prior to the murder. The letter refers to allegations of infidelity,  a description of a recent incident where Shaw stabbed Harris in the neck, and threats to end the relationship. One passage states that twelve hours before the murder, Harris told his sister that he was going to break up with Shaw. The letter is signed "JM." Ex. I, ECF No. 28-1. Harris' brother, Clarence Booker, signed an affidavit on May 3, 2010 stating that Harris told him about problems he was having with Shaw in the weeks before the murder. Harris told Booker that Shaw slashed Harris' tires and smashed his car windows a day or so before the murder. *See* Pl. Ex. E 1, ECF No. 27-6. Woods claims that disclosure of the May 13 letter would have led to defense counsel to interview Booker and ultimately an investigation resulting in the viable defense that Shaw murdered Harris.

Under *Brady*, there must be "direct or circumstantial evidence linking the third person to the actual perpetration of the crime." *Thorne*, 473 F. App'x at 467. Speculation is insufficient. *Bagley*, 644 F.3d at 325. The May 13 note amounts to "nothing more than rumor, hearsay, hearsay upon hearsay, hearsay upon hearsay upon hearsay, or worse. [The Defendant] has not explained how . . . it would have led to admissible evidence." *Gumm v. Mitchell*, 775 F.3d 345, 358 (6th Cir. 2014) (quoting *Gumm v. Mitchell*, No. 1:98-cv-838, 2009 WL 7785750, at *25 (S.D. Ohio Sept. 28, 2009)). The Court finds that Woods has not demonstrated that the disclosure of the May 13 letter would have created a reasonable probability of a different result.

19

IV.   Actual Innocence

The standard for showing actual innocence on habeas review is very difficult. Such claims are rarely successful. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). A petitioner must persuade the Court that, in light of new evidence, no juror, acting reasonably, would have found him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 329. A credible claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial." *Id.* at 324. By itself, a claim of actual innocence is an insufficient basis for granting habeas relief. *See Herrera v. Collins*, 506 U.S. 390, 404-05 (1993) (a freestanding claim of actual innocence is not itself a constitutional claim for which habeas corpus relief may be granted). Woods' claims of innocence, whether considered separately or together, do not persuade the Court that 'no juror, acting responsibly, would have voted to find him guilty beyond a reasonable doubt.' *Schlup*, 513 U.S. at 327. The petition will be denied.

## CERTIFICATE OF APPEALABILITY

Before Woods may appeal this decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  One may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484–5 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In

20

applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id.* at 336–37. The Court concludes that a certificate of appealability is warranted in this case because reasonable jurists could debate the Court's assessment of Woods' claims.

### ORDER

**WHEREFORE,** it is hereby ordered that the amended petition for a writ of habeas corpus (document no. 30) is **DENIED** and the matter is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED**.

**SO ORDERED**.


s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge
Dated: September 29, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 29, 2015, by electronic and/or ordinary mail.


s/Carol Cohron
Case Manager